# New Castle *v*. Cutler.

*Case stated—Summary conviction—Appeal to common pleas.*

Where, after a summary conviction for selling goods without a peddler's license before a mayor of a city, no appeal is taken to the quarter sessions, but an appeal is allowed by the common pleas, and taken to that court, and the parties subsequently agree upon a case stated which sets forth the facts in controversy, but does not set forth that the defendant was fined by the mayor, or that he took an appeal, the Superior Court will be confined to the facts presented by the case stated, and cannot treat the case as an appeal from the judgment of the court of quarter sessions in a case of summary conviction. The case will be disposed of as a civil action by the city to recover the amount of the license tax for which the defendant was alleged to be liable.

*Hawkers and peddlers—License tax—Act of May* 23, 1889, *P. L.* 274.

Article 5, section 4 of the act of May 23, 1889, authorizing cities to levy a license tax, is broad enough in its terms to cover an ordinance of a city imposing a license tax upon "all peddlers, hucksters and persons traveling from house to house with goods, wares, merchandise or produce of any kind for sale," and "all persons soliciting orders for goods, wares, merchandise, works of art, or any other kind of articles for sale."

*Constitutional law—Taxation—Classification—Province of the legislature and of the courts.*

The power to impose taxes belongs to the legislature; the selection of the subjects, their classification, and the method of collection are purely legislative matters, and the courts will not interfere except in a case of the grossest inequality. All that is required is that the classification shall be

made according to some reasonable, practicable rule, drawn from experience, which will prevent gross inequalities in the burdens of taxation.

*Constitutional law—Hawkers and peddlers—License tax—Classification—Act of May* 23, 1889.

An ordinance of a city of the third class imposing a license tax on "all peddlers, hucksters and persons traveling from house to house with goods, wares, merchandise or produce of any kind for sale," is not invalid because it imposes a graduated tax according to the amount of goods carried, or because it imposes an additional tax of twenty per cent upon any person who used a horse and wagon in his business; nor is such an ordinance vitiated because "farmers, gardeners, or other persons who raise, market and sell their own produce" were excepted out of its operations.

*Constitutional law—Hawkers and peddlers—Exemption of traveling salesmen from license tax on hawkers and peddlers.*

The exemption of traveling salesmen selling to dealers from a tax imposed on hawkers and peddlers is sustainable as a classification founded upon the difference between those who sell at retail, delivering directly to the consumer, and the representatives of wholesale houses established in some other city or state, who sell only to traders.

*Hawkers and peddlers—Definition—Ordinance.*

A hawker and peddler is an itinerant or traveling trader who carries goods about in order to sell them, and who actually sells them to purchasers in contradistinction to a trader who has goods for sale and sells them in a fixed place of business.

A city ordinance imposing a license tax on peddlers, hucksters and persons traveling from house to house with goods for sale, and upon all persons soliciting orders for goods, applies to a person who goes from house to house soliciting orders without goods in his possession, and subsequently delivers at the respective houses·of his several purchasers small quantities of goods, of a standard equal to that of the sample produced at his first visit, the undertaking upon the part of those with whom he dealt being to take and pay for the goods if, upon inspection at the time of delivery they found them to be up to the required standard.

*Constitutional law—Interstate commerce—License tax on hawkers and peddlers.*

It is within the police power of the state to pass a law requiring a peddler of goods to take out a license, even although these goods ·may have been brought from another state and are still the property of the importer.

When goods are sent from one state to another for sale, or in consequence of a sale, they become a part of its general property and amenable to its laws, provided that no discrimination be made against them as goods from another state and that they be not taxed by reason of being brought from another state, but only taxed in the usual way, as other goods are.

*Constitutional law—Interstate commerce—Goods in transportation.*

Goods in course of transportation from one state to another, and goods in the original package are not subject to state regulation.

The goods imported from a foreign country or a sister state are within the protection of the interstate commerce clause of the constitution, not only during the transportation, but must enter the interior of the state, and the importer is authorized to dispose of those articles introduced so that they may become mingled with the common mass of property within the territory entered. The power of the state over the goods imported commences when the importer has so acted upon the importation that it has become incorporated and mixed with the mass of property within the state, which happens when the original package is no longer such in his hands.

A resident and citizen of Pennsylvania, representing a firm of grocers doing business in Ohio, went from house to house taking orders for the delivery of a few pounds of coffee or prunes, or a small number of brooms or bars of soap. It was arranged between the salesman and his firm that the orders should be taken for such quantities of goods that they could be filled by delivering the coffee in two-pound packages and the prunes in five-pound packages, and that not less than twenty-five bars of soap or three brooms were to be sold to any one purchaser. The goods were shipped in one car. The packages of coffee and prunes were placed in boxes without lids. The soap was packed in boxes containing fifty bars each, and the brooms were tied in bundles to equal the aggregate amount of all the orders. None of the packages were marked with the name of the purchaser, but were consigned to the firm. When the car arrived at its destination, a member of the firm delivered the goods to the salesman, who loaded the goods on a wagon and delivered them to the purchasers. In making this delivery, the packages of two pounds of coffee, and five pounds of prunes were not opened, but the bunches of brooms were untied to fill orders. Boxes of soap were opened when only twenty-five bars had been ordered. The city in which these deliveries were made enacted an ordinance imposing a license tax on peddlers and persons traveling from house to house with goods for sale and on persons soliciting orders for goods. *Held*, (1) that the ordinance was not repugnant to the interstate commerce clause of the constitution of the United States; (2) that the goods brought from Ohio had become incorporated and mixed with the mass of property in this state, and that the commerce in them had become the domestic commerce of Pennsylvania; (3) that the device of placing the small packages of coffee and prunes in large open boxes was a mere device to evade the laws of Pennsylvania; (4) that the salesman was liable for the license tax under the ordinance.

Argued May 16, 1900. Appeal, No. 236, April T., 1900, by defendant, from judgment of C. P. Lawrence Co., June T., 1899, No. 55, on case stated in suit of New Castle v. F. W. Cutler. Before RICE, P. J., BEAVER, ORLADY, W. W. PORTER and W. D. PORTER, JJ. Affirmed.

Case stated to determine the validity of a license tax which the plaintiff claimed the defendant was liable to pay.

The case originated in a proceeding before Charles L. Warnock, Esq., mayor of the city of New Castle, which resulted in the conviction of the defendant for doing business without paying a license tax provided by the city ordinance. A petition for an appeal was presented to the court of common pleas by the defendant, and the appeal was allowed. Subsequently a motion to quash the appeal was made on the ground that the conviction of the defendant was by summary conviction and was appealable only to the court of quarter sessions. Subsequently the following stipulation was entered of record:

" On the motion to quash the appeal to the common pleas it was agreed by counsel that if the court should be of opinion that the appeal should have been taken to the quarter sessions, the appeal should be so amended and the case considered as pending in the quarter sessions court of Lawrence county."

On June 6, 1899, a case stated was filed which was as follows:

Now, June 6, 1899, in the above stated case pending in said court, it is hereby agreed by and between the parties that the following is a true statement of the facts and that the case be heard thereon:

1. E. C. Harley & Company, is a copartnership located and doing business as grocers in Dayton, in the state of Ohio, of which state the members of said firm are citizens. In conducting said business, E. C. Harley & Company employ agents who, under the direction of said firm, solicit orders for groceries in the state of Pennsylvania by going personally to residents and citizens of said state and, when necessary, from house to house in said state.

2. F. W. Cutler, the defendant, is a resident of the state of Pennsylvania, and was employed as an agent by E. C. Harley & Company, to travel and solicit orders for groceries by said firm in manner stated, upon a compensation by a fixed commission on the amount of the orders taken. Some time during the month of February, 1899, the said F. W. Cutler, as the agent of E. C. Harley & Company, came to the city of New Castle in the state of Pennsylvania, for the purpose of soliciting orders to be filled by his principals, E. C. Harley & Company, at Dayton, Ohio. The instructions from his house were to sell to purchasers in packages of not less than two pounds of coffee,

five pounds of prunes, twenty-five bars of soap, three brooms, and similar regulations as to other goods as to the quantity to be sold to each purchaser. The said F. W. Cutler, in the city of New Castle during the said month of February, went from house to house and from place to place in said city and took orders for goods in the manner aforementioned, to wit: for coffees, teas, sugar, prunes, soap, brooms, raisins, and such other goods as are usually kept by grocers. That after he had taken a large number of orders for goods he forwarded all of said orders to the said E. C. Harley & Company, at Dayton, Ohio, whereupon the said E. C. Harley & Company, filled the said orders as follows: by putting up in packages the groceries ordered, viz: coffee in two-pound packages marked "two pounds coffee," prunes in five-pound packages marked "five pounds prunes," soaps in boxes of fifty bars each, some of the soap being in pound bars in the manufacturer's wrapper and not boxed, and brooms tied together, and other articles in similar manner. The goods were all shipped in one car, the small packages standing together in boxes without lids, and none of the packages was marked or labeled with the name of the purchaser. The goods were consigned to E. C. Harley & Company at New Castle, where said firm received them and paid the freight.

3. The orders taken by said F. W. Cutler had indorsed upon them respectively the name of the purchaser, with the street and number of the purchaser's residence, and five per cent was added to amount of each order to cover freight, drayage and packing. A copy of the order was left with each purchaser. Under the contract, the goods were shipped at the risk of E. C. Harley & Company, and each purchaser had the right to examine the goods when delivered and, if the same were not equal to sample shown at the time order was taken, could refuse to accept them.

4. A member of the firm of E. C. Harley & Company came to New Castle and received the car of goods and brought with him the orders upon which the car was packed and shipped as above stated. When the car arrived at New Castle, F. W. Cutler, the defendant, with a wagon and two horses drove to the car and received such packages of "two pounds coffee," "five pounds prunes," bunches of brooms, etc., and soap in

boxes of fifty bars each or, for small orders, bars in manufacturer's wrappers without boxes, as would fill the orders taken on a selected street or streets and also the original orders therefor taken by him.  Having the goods placed on the wagon, the defendant then drove to the selected streets on which such orders had been taken and where such goods were to be delivered by E. C. Harley & Company, and stopped at the houses of such purchasers.  Here he took from the stock of goods in the wagon such packages of two pounds coffee, five pounds prunes, and such number of brooms and boxes or bars of soap and other articles in like manner as would fill the respective orders as he arrived at the dwelling houses of the several purchasers; e. g. where a purchaser had ordered " two pounds coffee," " five pounds prunes," " five pounds sugar," and twenty-five bars of soap, the said Cutler would take from the stock of goods on the wagon a package of two pounds coffee, a package of five pounds prunes, a package of five pounds sugar and twenty-five bars of soap, taking the latter from a box containing fifty bars in certain cases. In making such deliveries the packages of " two pounds coffee," " five pounds sugar," or " five pounds prunes," were not opened, the bunches of brooms were untied to fill small orders, and the soap was delivered in boxes of fifty bars each, except in case of orders for twenty-five bars, when a box would be opened and twenty-five bars in the manufacturer's wrappers would be used to fill such order.

5. Under the contract between E. C. Harley & Company, and F. W. Cutler, the said Cutler became responsible to E. C. Harley & Company, to account for the said goods, and if any of the goods were not received at delivery, the same were to be returned by Cutler to E. C. Harley & Company.  Under the orders taken as aforesaid, the purchasers were not to pay for the goods ordered until delivered, and E. C. Harley & Company retained the custody and control of said goods until actual delivery.  The purchase price was paid to F. W. Cutler by the respective purchasers upon delivery, and the money was sent to E. C. Harley & Company.

6. F. W. Cutler, the defendant, was engaged in delivering the goods as herein set out in the said city of New Castle with two horses and a wagon on April 20, 1899, at the time of his arrest.  The amount of goods carried by Cutler in his wagon

exceeded $10.00 in value. Said Cutler at the time of his arrest and before, was not otherwise employed than as stated, and while so engaged was acting solely for E. C. Harley & Company.

7. The city of New Castle is a municipal corporation of the State of Pennsylvania, a city of the third class, and had enacted an ordinance, in force at date of the arrest of said Cutler, approved August 25, 1890, and a true copy of the same is hereto annexed, made a part hereof, and marked Exhibit "A."

8. At the time of his arrest the defendant, F. W. Cutler, was not and had not been selling or offering for sale any goods, wares or merchandise in any other mode or manner than making the deliveries of goods and securing the purchase money as herein stated; and in making such deliveries he did not offer or deliver any goods, except those ordered, nor to any other person or persons than those who had ordered goods as aforesaid, and, to them, delivered only the goods ordered.

9. That the defendant, F. W. Cutler, at the time he solicited the orders aforesaid, and at the time he delivered the goods aforesaid, and at the time of his arrest, did not have a license as a hawker or peddler or any other license to carry on, or continue, or transact in the said city of New Castle any of the businesses mentioned in said ordinance.

10. If the court should be of opinion, upon the facts stated, that the defendant, F. W. Cutler, was liable to take out a license and pay the license fee or tax prescribed by said ordinance then judgment to be entered for the plaintiff, the city of New Castle, for $24.00. If the court should be of opinion that said F. W. Cutler was not so liable, then judgment to be entered for the defendant. The costs to follow the judgment, and either party reserving the right to sue out a writ of error or take other appeal therein.

The eleventh and thirteenth sections of the ordinance in question are as follows:

"Sec. 11. All peddlers, hucksters and persons traveling from house to house with goods, wares, merchandise or produce of any kind for sale, shall be classified, and pay as follows:

"Class 1, having goods, wares, merchandise or produce of the value of $10.00 or over shall pay $20.00; class 2, having goods, wares, merchandise or produce of the value of $7.00 and under

$10.00 shall pay $15.00; class 3, having goods, wares, merchandise or produce of the value of $4.00 and under $7.00 shall pay $10.00; class 4, having goods, wares, merchandise or produce of less value than $4.00 shall pay $7.00; provided, however, that any person using a horse and wagon in said business shall pay twenty per cent additional, and provided further that this section shall not apply to farmers, gardeners or other persons, who raise, market and sell their own produce."

"Sec. 13. All persons selling or leasing goods, wares or merchandise upon instalments shall pay $25.00. All persons soliciting orders for goods, wares, merchandise, works of art or any other kind of article for sale, shall pay $20.00, provided however that this shall not apply to traveling salesmen selling to dealers."

The court in an opinion by WALLACE, P. J., entered judgment for plaintiff for $24.00 on case stated.

*Error assigned* was the judgment of the court.

*C. H. Akens*, for appellant.—The appellant while delivering groceries for his principals in April, which had been ordered in February, was not a peddler, within the meaning of the ordinance.

The appellant while soliciting and obtaining orders for groceries in February for his principal was not a peddler, within the meaning of the ordinance: Robbins v. Shelby County Taxing District, 120 U. S. 489; Corson v. Maryland, 120 U. S. 502; Asher v. Texas, 128 U. S. 129.

The appellant by soliciting and obtaining orders for groceries in February, and in April making deliveries of the groceries to the persons who had ordered them from his principals, did not engage in the business of peddling, within the meaning of the ordinance: Com. v. Eichenberg, 140 Pa. 158; Com. v. Farnum, 114 Mass. 267; City of Davenport v. Rice, 75 Iowa, 74; Town of Spencer v. Whiting, 68 Iowa, 678; Kennedy v. People, 9 Colo. App. 490; Emmons v. City of Lewistown, 132 Ill. 380; City of Waterloo v. Heely, 81 Ill. App. 310: Kimmel v. City of Americus, 31 S. E. Repr. 623; City of Greensboro v. Williams, 124 N. C. 167; Com. v. Moore, 21 Pa. C. C. R. 321.

The ordinance, if a police ordinance, is invalid: Sayre Bor-

620            NEW CASTLE *v.* CUTLER.

ough v. Phillips, 148 Pa. 482; Shamokin Borough v. Flannigan, 156 Pa. 43; Cohen v. Plymouth Borough, 7 Kulp, 101; West Pittston Borough v. Dymond, 8 Kulp, 12; Sharon Borough v. Golden, 4 Pa. C. C. R. 357; Conshohocken Borough v. Fennel, 5 Pa. C. C. R. 65; Easton City v. Easton Beef Co., 5 Pa. C. C. R. 68; Sansford Borough v. Brode, Pa. C. C. R. 221; Wilcox v. Knoxville Borough, 12 Pa. C. C. R. 641; Port Clinton Borough v. Shafer, 18 Pa. C. C. R. 67.

The ordinance is not a police regulation, but is a tax or revenue measure: Com. v. Harmel, 166 Pa. 89; Com. v. Brinton, 132 Pa. 69; Com. v. Gardner, 133 Pa. 284; Com. v. Clark, 10 Pa. Superior Ct. 507; City of Williamsport v. Wenner, 172 Pa. 173; Oil City v. Oil City Trust Co., 151 Pa. 454.

As a tax or revenue measure the ordinance violates the Constitution of Pennsylvania and is void: Com. v. Sharon Coal Co., 164 Pa. 304; Com. v. Clark, 10 Pa. Superior Ct. 507; Fox's App., 112 Pa. 337; Com. v. Germania Brewing Co., 145 Pa. 83; Pittsburg v. Coyle & Co., 165 Pa. 61; Lloyd v. Smith, 176 Pa. 213; Laramie Co. v. Albany Co., 92 U. S. 307; City of Williamsport v. Wanner, 172 Pa. 173; North Wales Borough v. Brownback, 10 Pa. Superior Ct. 227.

In doing the acts set out in the case stated the appellant was carrying and transporting groceries in transit as commerce from the state of Ohio into the state of Pennsylvania to their places of destination in the city of New Castle, Pennsylvania, for final disposal and use by the persons who had ordered them, and no license tax can be exacted from him for so doing by the city of New Castle: Welton v. Missouri, 91 U. S. 275; Brown v. Houston, 114 U. S. 622; Brennan v. Titusville, 153 U. S. 289; Lyng v. Michigan, 135 U. S. 161; Robbins v. Shelby County Taxing District, 120 U. S. 489; Asher v. Texas, 128 U. S. 129; McCall v. California, 136 U. S. 104; Crutcher v. Kentucky, 141 U. S. 47; Leisy v. Hardin, 135 U. S. 100; Rhodes v. Iowa, 170 U. S. 412; The Daniel Ball, 10 Wall. 557; Ex parte Koehler, 30 Fed. Rep. 867; Pensacola Telegraph Co. v. Western Union Telegraph Co., 96 U. S. 1; Gibbens v. Ogden, 9 Wheat, 1; Brown v. Maryland, 12 Wheat. 419; Leloup v. Mobile, 127 U. S. 640; Bowman v. Chicago, etc., Ry. Co., 125 U. S. 465.

*James A. Gardner*, city solicitor, for appellee.—Classification

according to the amount of business done is recognized by our state and the federal courts : Dow v. Beidelman 125 U. S. 680 ; City of Allentown v. Gross, 132 Pa. 319 ; Hadtner v. City of Williamsport, 15 W. N. C. 138 ; City of Williamsport v. Wenner, 172 Pa. 173 ; Com. v. Germania Brewing Co., 145 Pa. 83 ; Pittsburg v. Coyle & Co., 165 Pa. 61 ; Germania Life Ins. Co. v. Com., 85 Pa. 513 ; Roup's Case, 81* Pa. 211 ; Com. v. Delaware Div. Canal Co., 123 Pa. 594 ; Com. v. Muir, 1 Pa. Superior Ct. 578 ; Com. v. Clark, 10 Pa. Superior Ct. 507.

Under the facts in this case, T. W. Cutler when arrested was plying the vocation of a peddler, and a calling, occupation or business which comes within the police powers of the state : Com. v. Gardner, 133 Pa. 289 ; Com. v. Edson, 2 Pa. C. C. R. 377 ; Com. v. Ober, 12 Cush. 493, 495 ; Warren. Borough v. Geer, 117 Pa. 207 ; Graffty v. City of Rushville, 107 Ind. 502 ; North Wales Borough v. Brownback, 10 Pa. Superior Ct. 227 ; Haldeman v. Duncan, 51 Pa. 66 ; Hutchinson v. Hunter, 7 Pa. 140 ; Hutchison v. Com., 82 Pa. 472 ; Garbracht v. Com., 96 Pa. 449 ; O'Neil v. Vermont, 144 U. S. 324 ; Ficklen v. Shelby County Taxing Dist., 145 U. S. 1 ; Com. v. Harmel, 166 Pa. 89 ; Emert v. Missouri, 156 U. S. 296 ; Com. v. Dunham, 191 Pa. 73.

No state can prohibit any proper subject of commerce to enter its territory : Leisy v. Hardin, 135 U. S. 100 ; Bowman v. Chicago, etc., Ry. Co., 125 U. S. 465 ; Schollenberger v. Pennsylvania, 171 U. S. 1 ; Prentice & Egan on the Commercial Clause of the Federal Constitution.

When the goods come into the state, i. e., imported, and especially when they come into this state, as did the goods of E. C. Harley & Company, they are subject to our laws and to our taxation ; and this is also true even with reference to goods in original packages : Woodruff v. Parham, 8 Wall. 123 ; Hopkins v. United States, 171 U. S. 578 ; Robbins v. Shelby County Taxing Dist., 120 U. S. 489 ; Brown v. Houston, 114 U. S. 622 ; Machine Co. v. Gage, 100 U. S. 676 ; Pittsburg, etc., Coal Co. v. Bates, 156 U. S. 577 ; Com. v. Harmel, 166 Pa. 89 ; O'Neil v. Vermont, 144 U. S. 324 ; Ficklen v. Shelby County Taxing Dist., 145 U. S. 1 ; Emert v. Missouri, 156 U. S. 296.

OPINION BY W. D. PORTER, J., January 22, 1901:

In passing upon the questions presented by this record we are confined to the facts presented by the case stated. This cannot be treated as an appeal from the judgment of the court of quarter sessions in a case of summary conviction, for the case as stated does not set forth that the defendant was fined by the mayor, nor that he appealed from that judgment, nor that his appeal was, upon application to the court of quarter sessions, allowed by that court. The agreement of the parties was that "if the court should be of opinion upon the facts stated that the defendant, F. W. Cutler, was liable to take out a license and pay the license fee or tax prescribed by said ordinance," then judgment to be entered for the plaintiff in the amount for which judgment was entered by the court below. The 15th section of the ordinance in question, in addition to imposing a fine for the violation of its terms, provided that such prosecution for the penalty should not affect the right of the city to collect said license tax by an action of debt, or otherwise. We must dispose of this case as a civil action by the city to recover the amount of the license tax for which the defendant is alleged to be liable. If the facts as stated required the defendant to pay a tax and take out a license under any of the sections of the ordinance, then the judgment of the court below must be affirmed, for the sole question presented by the case stated is : Did the character of business carried on by the defendant fall within any of the classes which were by the ordinance required to take out a license ?

The ordinance appears upon its face to be an exercise of the powers of taxation, and the warrant of the city to impose the tax is to be found in the Act of May 23, 1889, P. L. 274: City of Williamsport v. Wenner, 172 Pa. 173. The act, article 5, section 4, authorized cities to levy and collect for general revenue purposes a license tax, not exceeding $100 each, annually, on all auctioneers, hawkers, peddlers, produce or merchandise venders, etc.; including most of the business avocations which make up the traffic of a city. In the exercise of the powers conferred by this act of assembly, the city of New Castle enacted the ordinance in question, which in its 11th section provides : " All peddlers, hucksters and persons traveling from house to house with goods, wares, merchandise or produce of any kind

for sale shall be classified and pay as follows: Class 1. Having goods, wares, merchandise or produce of the value of ten dollars or over shall pay twenty dollars. Class 2. Having goods, wares, merchandise or produce of the value of seven dollars and under ten dollars shall pay fifteen dollars. Class 3. Having goods, wares, merchandise or produce of the value of four dollars and under seven dollars shall pay ten dollars. Class 4. Having goods, wares, merchandise or produce of less than four dollars shall pay seven dollars. Provided, however, that any person using a horse and wagon in said business shall pay twenty per cent additional; and provided, further, that this section shall not apply to farmers, gardeners or other persons who raise, market and sell their own produce." Section 13 ordained, among other things, that "all persons soliciting orders for goods, wares, merchandise, works of art, or any other kind of article for sale shall pay twenty dollars; provided, however, that this shall not apply to traveling salesmen selling to dealers." The terms of the act of assembly are certainly broad enough to cover all the classes of vendors of merchandise taxed by these sections of the ordinance. The only objection to these provisions of the ordinance, as applied to domestic commerce, is that the tax imposed by the 11th section offends against the provision of the constitution of Pennsylvania, which requires that all taxes shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax. The constitution does not withdraw the power of classification from the legislature; indeed, the power is necessarily implied in the constitutional provision to which this ordinance is supposed to be obnoxious. The power to impose taxes belongs to the legislature; the selection of the subjects, their classification and the method of collection are purely legislative matters. When the action of the legislature with respect to these matters is not repugnant to the constitution, it would certainly be a case of the grossest inequality which would call for the intervention of the courts. All that is required is that the classification shall be made according to some reasonable, practicable rule, drawn from experience, which would prevent gross inequality in the burdens of taxation. Absolute equality of taxation is difficult of attainment, and an approximate equality is all that can reasonably be expected. If there is a substantial

uniformity there is a compliance with the constitutional provision: Kelly v. City of Pittsburg, 85 Pa. 170; Fox's Appeal, 112 Pa. 337; Commonwealth v. Delaware Div. Canal Company, 123 Pa. 594. The act of 1889 delegated to councils of cities of the third class a discretion to classify merchants, or others, according to the amount of their gross sales, and to assess a tax according to such sales: Williamsport v. Wenner, supra; Commonwealth v. Clark, 10 Pa. Superior Ct. 507. As to merchants having a fixed place of business, the amount of the gross sales was probably the most equitable classification which the taxing power could have selected as the basis for assessment of the tax. When it came to dealing with itinerant traders, however, a different question was presented. They were here to-day and away to-morrow, and to arrive at any fair estimate of the amount of business done by them would be difficult for the taxing powers to accomplish. Yet it cannot be said that they were not proper subjects of classification, founded upon the amount of capital employed, or the manner in which they carried on their business. The power of classification is inherent in the power of taxation, and it would seem that the only limit upon this power is that such classification shall be in such manner as to produce as much uniformity and equality in taxation as possible. So long as the discretion is not abused, or a classification adopted which is unjust and unreasonable, it is not the province of the court to say that the legislative power might have adopted a more equitable mode of assessing taxes. The taxing power of the city of New Castle in classifying these itinerant traders made the amount of the tax contingent upon two conditions: first, the amount of goods carried; second, the manner in which they were carried. We cannot say that it is unreasonable to tax an avocation upon the basis of the capital employed therein, as that certainly constitutes one element from which the amount of business done may be estimated. That he who uses a horse and wagon to transport his goods may reasonably be presumed to distribute them more rapidly is equally clear, and to impose an additional tax of twenty per cent upon the peddler who enjoyed that advantage is not such an abuse of the taxing power as would justify the court in striking down the ordinance. The classification of those who were to pay under this section was neither unjust nor inequitable.

Nor is the section vitiated because "farmers, gardeners or other persons who raise, market and sell their own produce," were excepted out of its operation. Those who were excepted were not dealers. They did not buy to sell again, and the selling of the products of their own lands was but an incident of their farming operations. Under the terms of this ordinance the farmer was only exempted so long as his sales were confined to what he himself had raised. Even if the exception had not been embraced in the ordinance, the farmer would not have been required to take out a license, under its terms : Commonwealth v. Gardner, 133 Pa. 284. In a case recently decided by the Supreme Court of the United States, not yet reported, American Sugar Refining Company v. State of Louisiana, it was said : "But from time out of mind it has been the policy of this government not only to classify for purposes of taxation, but to exempt producers from the taxation of the methods employed by them to put their products upon the market." The ordinance in question was a legitimate exercise of the taxing power as applied to domestic commerce. The exemption of traveling salesmen selling to dealers from the tax imposed by the 13th section of the ordinance is clearly sustainable as a classification, founded upon the difference between those who sell at retail, delivering directly to the consumer, and the representatives of wholesale houses, established in some other city or state, who sell only to traders.

The defendant contends, however, that even if the ordinance is valid, he does not come within its provisions, because he was not a peddler. The leading primary idea of a hawker and peddler is that of an itinerant or traveling trader, who carries goods about, in order to sell them, and who actually sells them to purchasers, in contradistinction to a trader who has goods for sale and sells them in a fixed place of business. But this ordinance goes further, and not only taxes actual hawkers and peddlers whose employment is that of traveling traders, and thus seems to refer to a business or habitual occupation, but it extends to all persons traveling from house to house with goods, wares, merchandise or produce of any kind for sale. Under these general terms this defendant certainly came. It is true that when he first visited houses he did not have his goods with him to deliver at the time, but he went from house to house for

the purpose of selling goods, and he agreed to deliver them at the several houses. The facts agreed upon make it clear that the original undertaking of the defendant was to deliver at the respective houses of his several purchasers small quantities of goods, of a standard equal to that of a sample produced; the undertaking upon the part of those with whom he dealt was to take and pay for these goods if, upon inspection at the time of delivery, they found them to be up to the required standard. Until the goods were actually tendered, inspected and accepted, they remained the property of the vendor. When he hauled them from house to house his purpose was to complete the executory contracts of sale, and the sale was never consummated until the goods were actually delivered. The goods were never separated from the other property of the vendor, nor in any manner designated as the property to be delivered to the purchasers until, upon arriving with his wagon in front of the house of some person with whom he had a contract, he selected at random from the load upon his wagon a sufficient number of packages to fill his order, if upon inspection by the proposed purchaser the contents of the packages were found to be satisfactory. He was, therefore, traveling from house to house with goods for sale and did sell them. This was clearly within the broad terms of the 11th section of the ordinance in question. It was, in fact, peddling, by whatever other name it may be called: North Wales Borough v. Brownback, 10 Pa. Superior Ct. 227; Warren Borough v. Geer, 117 Pa. 207. Even if the avocation of the defendant had not been such as to come within the operation of the 11th section, there can be no question that he traveled from house to house soliciting orders for goods, and was, therefore, taxable under the 13th section of the ordinance.

The final objection of the defendant is that the ordinance is repugnant to the constitution of the United States, because an intrusion upon the exclusive right of congress to regulate commerce with foreign nations and among the several states. The defendant was a resident and citizen of Pennsylvania, but if the business in which he was engaged in the city of New Castle was directly connected with interstate commerce, it was not within the power of the city to impose a tax upon that business. Where a business or occupation consists in the sale of goods,

the license tax required for its pursuit is in effect a tax upon the goods themselves: Welton v. Missouri, 91 U. S. 275. The exaction of a license tax as a condition of doing any particular business is a tax upon the occupation, and a tax on the occupation of doing a business is a tax on the business: Leloup v. Mobile, 127 U. S. 640; Brennan v. Titusville, 153 U. S. 289. If the business is interstate or foreign commerce, it matters not whether the person therein engaged is or is not a citizen of the state which imposes the tax: Schollenberger v. Pennsylvania, 171 U. S. 1. The mere fact that the principals whom the defendant represented were citizens of Ohio is without weight in determining whether the transactions of the defendant involved only domestic commerce, to be controlled by the laws of Pennsylvania, or interstate commerce and within the protection of the powers of the national government. The citizen of Pennsylvania and the citizen of any other state are alike within the protection of the provisions of the constitution of the United States in bringing goods into the state for purposes of sale, or in consequence of a sale. It is within the police power of the state to pass a law requiring peddlers of goods to take out a license, even although those goods may have been brought from another state and are still the property of the importer. This was the unanimous opinion of the Supreme Court of the United States, upon full review and consideration of all the authorities, in the case of Emert v. Missouri, 156 U. S. 296. When goods are sent from one state to another, for sale, or in consequence of a sale, they become a part of its general property and amenable to its laws; provided that no discrimination be made against them as goods from another state, and that they be not taxed by reason of being brought from another state, but only taxed in the usual way, as other goods are: Brown v. Houston, 114 U. S. 622. A tax on business carried on within the state and without discrimination between its citizens and the citizens of other states may be constitutionally imposed and collected: Osborne v. Mobile, 16 Wallace, 479. Restraint of the higher law of the constitution of the United States only prevents the levy of a tax, or the requirement of a license, for making negotiations in the conduct of interstate commerce. A state may, by virtue of its police power, enact laws for the security of the lives, limbs, health and comfort of persons, and the protection

of property, or when it does those things which may otherwise incidentally affect commerce, such as the establishment and regulation of highways and other commercial facilities, or to regulate or restrict the sale of articles deemed injurious to the health or morals of a community; under its powers of taxation it may impose taxes upon persons residing within the state, or belonging to its population, and upon avocations and employments pursued therein not directly connected with foreign or interstate commerce: Robbins v. Shelby County Taxing District, 120 U. S. 489. The importer, whether he be a citizen of Pennsylvania or not, may sell the goods in the original packages, unbroken and unopened, free from state regulation: Schollenberger v. Pennsylvania, supra; Leisy v. Hardin, 135 U. S. 100; Lyng v. Michigan, 135 U. S. 161. Goods delivered to a common carrier at a point without the state, consigned to a purchaser at his residence within the state, are exempt from state regulation during the course of transportation: Rhodes v. Iowa, 170 U. S. 412. It is not within the power of the state to impose a tax on the making of contracts within the state for the sale of goods to be delivered by a manufacturer in another state to a common carrier, consigned to the purchaser within the state where the contract is made: Brennan v. Titusville, supra. The goods imported from a foreign country or a sister state are within the protection of the interstate commerce clause of the constitution not only during the transportation, but must enter the interior of the state, and the importer is authorized to dispose of those articles introduced, so that they may become mingled with the common mass of property within the territory entered. The power of the state over the goods imported commences when the importer has so acted upon the importation that it has become incorporated and mixed with the mass of property in the state, which happens when the original package is no longer such in his hands: Brown v. Maryland, 12 Wheaton, 419; Leisy v. Hardin, supra.

The contracts into which the defendant entered did not necessarily involve interstate commerce. The contract was made in Pennsylvania for the delivery of goods at the residence of the proposed purchaser in Pennsylvania. The goods were to be up to a certain standard, but there was nothing in the contract to prevent the defendant, or those whom he represented, from mak-

ing a tender of fulfillment of the contract, by bringing goods of the standard required from any city within the state of Pennsylvania. If, therefore, his transactions are to be brought within the protection of the interstate commerce clause of the constitution, it must be because of the manner in which the contracts were executed. These contracts were for the delivery of a few pounds of coffee or prunes, or a small number of brooms, or bars of soap, to each of the prospective purchasers. For the convenience of the defendant and his principals, it was arranged between them that the orders should be taken for such quantities of goods that they could be filled by delivering the coffee in two-pound packages, and the prunes in five-pound packages; not less than twenty-five bars of soap or three brooms were to be sold to any one purchaser. The defendant, having agreed to make these deliveries, sent the orders to his principals, who resided at Dayton, Ohio, and there did business as grocers. The principals, Harley & Company, then placed in a car a sufficient number of two-pound packages of coffee, five-pound packages of prunes, boxes of soap containing fifty bars each, and brooms tied in bundles to equal the aggregate amount of all the orders. " The goods were all shipped in one car, the small packages standing together in boxes without lids, and none of the packages were marked or labeled with the name of the purchaser." The goods were consigned to the shippers themselves at New Castle. A member of the firm of Harley & Company, the shippers, as well as the consignees, came to New Castle and took charge of the car. " F. W. Cutler, the defendant, with a wagon and two horses drove to the car and received such packages of two pounds coffee, five pounds prunes, bunches of brooms, etc., and soap in boxes of fifty bars each, or for small orders bars in manufacturer's wrappers without boxes, as would fill the orders taken on a selected street or streets." " Having the goods placed on the wagon the defendant then drove to the selected streets on which such orders had been taken and where such goods were to be delivered by Harley & Company, and stopped at the house of each purchaser. Here he took from the stock of goods on the wagon such packages of two pounds coffee, five pounds prunes and such number of brooms and boxes or bars of soap, and other articles in like manner, as would fill the respective orders as he arrived at the dwelling houses of the several purchasers:

e. g. where a purchaser had ordered two pounds coffee, five pounds prunes, five pounds sugar and twenty-five bars of soap, the said Cutler would take from the stock of goods on the wagon a package of two pounds coffee, a package of five pounds prunes, a package of five pounds sugar and twenty-five bars of soap, taking the latter from a box containing fifty bars in certain cases. In making such deliveries the packages of two pounds coffee, five pounds sugar and five pounds prunes were not opened, the bunches of brooms were untied to fill such orders, but the soap was delivered in boxes of fifty bars each, except in cases of orders for twenty-five bars, when the box would be opened and twenty-five bars in the manufacturer's wrappers would be used to fill such order." The defendant thus took load after load from the car until all the goods had been distributed. Under the contract between Harley & Company and Cutler, Cutler became responsible to Harley & Company to account for the goods, and if any of the goods were not received at delivery the same were to be returned by Cutler to Harley & Company. Under the orders taken the purchasers were not to pay for the goods ordered until delivered, and Harley & Company retained the custody and control of the goods until actual delivery. The purchase price was paid to Cutler by the respective parties upon delivery, and the money was by him sent to Harley & Company. It thus clearly appears that the importer of these goods was the defendant, or his principals, Harley & Company; that as to at least a part of the goods, the original packages in which they had been imported were broken up and the contents delivered to several different purchasers; the packages did not, therefore, remain unbroken, original packages, in the lands of the importer, and the commerce in them had become the domestic commerce of Pennsylvania. It is admitted in the case stated, that the boxes of soap were opened and their contents distributed, and a like course was pursued with the bundles of brooms, which fact alone is sufficient to take the business of this defendant out of the protection of the interstate commerce provisions of the Constitution of the United States, and render his avocation liable to taxation by the state of Pennsylvania. Upon the face of the case stated it would appear that the small packages of sugar, prunes and coffee were placed in large open boxes during the process

of transportation. It is, therefore, manifest that these small packages were not intended by the shippers as packages of commerce, and that they were placed in the large open boxes for the purpose of being imported into the state of Pennsylvania, and that the lids were only left off these boxes as a device to evade the laws of this commonwealth. Such a device as this was resorted to in the transactions out of which grew the case of Austin v. The State of Tennessee, recently decided by the Supreme Court of the United States and not yet reported, and it was there held that the parcels, for the purpose of commercial shipment, having been aggregated, thrown into and carried in an open basket, and thus associated in their shipment, they could not, after their arrival, be segregated so as to cause each to become an original package. This defendant sold no original packages except in those rare instances in which one customer took a whole box of soap. The goods were never separated from the other goods of the defendant until after their arrival in the city of New Castle. The articles were never designated and set apart for the purchasers in the state of Ohio; during the transportation they were the absolute property of the consignees. When the primary agreement was made it was not within the contemplation of the parties that the goods should be delivered by the vendor to a common carrier and consigned to the proposed purchasers. There was in this traffic nothing which can be said to have impressed upon it the character of interstate commerce.

The judgment is affirmed.